UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------x
PAULETTE VAUGHN and JOY VAUGHN,

                                        Plaintiffs,

        -against-

CONSUMER HOME MORTGAGE
COMPANY, INC. (CHM), THE
FORECLOSURE NETWORK OF NEW
YORK, INC. (FNNY), MICHAEL ASHLEY,
individually and in his capacity as an
officer and/or substantial shareholder of
CHM, JAS PROPERTY SERVICES a/k/a
JAS LLC, ABN AMRO MORTGAGE
GROUP, INC., as assignee of and successor
to CHM, MICHAEL PARKER, individually
and in his capacity as officer/ employee of
CHM, GARY LEWIS, individually and as
President of FNNY, JOSHUA SMILING,
CHARLES SALVA APPRAISALS, INC.,
CHARLES SALVA, MARTIN SILVER,
ESQ., ANN MCGRANE, ESQ., KENNETH
GOLDEN, ESQ. and ALPHONSO
JACKSON, as Secretary of the UNITED
STATES DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT,

                                        Defendants.
----------------------------------------------x
DANA Y. BANKS and DAVID B.
MOUNSEY,

                                        Plaintiffs,

        -against-

CONSUMER HOME MORTGAGE
COMPANY, INC., ET AL.

                                        Defendants.
----------------------------------------------x

<u>MEMORANDUM AND ORDER</u>
01-CV-7937 (ILG)

GLASSER, United States District Judge:

The plaintiffs move, pursuant to Fed. R. Civ. P. 59, for reconsideration of this court's prior order, entered on August 4, 2006, granting the motion of defendant United States Department of Housing and Urban Development ("HUD")[1] to dismiss for lack of subject matter jurisdiction, granting the motion of defendant Martin Silver, Esq. ("Silver"), for summary judgment as to all of the claims remaining against him, and denying the plaintiff Paulette and Joy Vaughn's (collectively, "Vaughns") motion to file a Second Amended Complaint, so as to add claims against proposed defendants Sloan Cooper, Peter Cooper, Bank, Tanen & Bank, and Jeffrey Tanen, Esq. See Vaughn v. Consumer Home Mortgage, No. 01-cv-7937, 2006 WL 2239324 (E.D.N.Y. August 4, 2006) (slip copy) (hereinafter "Vaughn III"). For the reasons stated below, the plaintiffs' motion is granted in part and denied in part. To the extent that the court grants reconsideration of its prior order, it finds that defendant Silver is entitled to summary judgment on grounds other than those initially stated, and enters an order to that effect.

## BACKGROUND

The instant motion follows several previous decisions, familiarity with which is assumed.[2] See Vaughn v. Consumer Home Mortgage, Inc., 293 F. Supp. 2d 206 (E.D.N.Y. 2003) (granting in part and denying in part HUD's motion to dismiss the

---

[1] The caption has been altered to reflect the substitution of the Honorable Alphonso Jackson, in his official capacity as the current Secretary of Housing and Urban Development, for his predecessor in office pursuant to Fed. R. Civ. P. 25(d)(1).

[2] The court's summary of the underlying facts is taken largely verbatim from its presentation of those facts in Vaughn III. See 2006 WL 2239324, at *2.

plaintiffs' claims for injunctive relief) (hereinafter "Vaughn I"); Vaughn v. Consumer Home Mortgage Inc., No. 01-cv-7937, 2003 WL 21241669 (E.D.N.Y. March 23, 2003) (hereinafter "Vaughn II"); Vaughn III, supra.  Only those facts relevant to the disposition of the pending motions for reconsideration will be restated here.

The Vaughns are joint purchasers of residential property located at 247 Cooper Street in Brooklyn, New York.  Banks and Mounsey are the joint purchasers of residential property located at 415 Pennsylvania Avenue in Brooklyn, New York. Plaintiffs purchased their respective properties through Defendant Foreclosure Network of New York ("FNNY").  See Vaughn I, 293 F. Supp. 2d at 208.  Plaintiffs initiated suit against FNNY and other defendants affiliated with that company, the attorneys who represented the plaintiffs during closing proceedings,[3] alleging that they made false representations with the intent to deceive them into purchasing properties at inflated prices.  See id.  As a component of the alleged scheme, FNNY steered the plaintiffs toward defendant Consumer Home Mortgage ("CHM"), a lender that the plaintiffs allege it consistently used to further the predatory lending scheme, in part by submitting fraudulent appraisal reports to HUD in order to obtain mortgage insurance available to qualifying low-income applicants under the Fair Housing Act ("FHA") .  Id. at 209.[4]

---

[3] Defendants Ann McGrane and Martin Silver are attorneys who represented the Vaughns during the execution of their contract to purchase the home at 247 Cooper Street, and at the closing of that transaction, respectively.

[4] Prior to the court's decision in Vaughn III, several defendants made an offer of judgment pursuant to Fed. R. Civ. P. Rule 68 in the amount of $500,000.  That offer was accepted and the judgment amount has been fully paid. The settling defendants were: Michael Ashley, Mindy Ashley, Option-to-buy, Ltd., Suzanne Shiavetta, Consumer Home Mortgage, Inc., Michael Parker, Robert Standfast, and Kenneth Golden.  ("Notice of Acceptance of Offer of Judgment," Docket No. 118).

Peter D. Cooper was the managing member, and Sloan Cooper managed the day-to-day operations, of defendant JAS Property Services LLC ("JAS"). JAS, through Sloane Cooper, invested in at least twenty properties which were marketed and sold by FNNY. Jeffrey Tanen and his law firm represented JAS through the filing of the complaint in this matter. JAS provided the financing for FNNY's purchase of distressed property in return for the payment, in the case of the home purchased by plaintiffs, of eighteen percent interest on the loan extended by JAS. The plaintiffs sought to amend their complaint for a second time so as to add claims against Peter and Sloan Cooper, Banks, Tanen & Bank, and Jeffrey Tanen (collectively, the "Proposed Tanen Defendants") for aiding and abetting the other defendants' fraudulent scheme and for deceptive trade practices

The plaintiffs also brought actions against HUD, asserting that HUD had a duty to prevent housing discrimination against plaintiffs as African-American home buyers, and that HUD's failure to institute policies to protect against manipulation by predatory lenders, including HUD's co-defendants, constitutes an abrogation of that duty. The plaintiffs' complaints allege violations of the National Housing Act, 12 U.S.C. §§1708-1709, as well as claims under the FHA, 42 U.S.C. §§ 3601 et seq., specifically § 3608(e), arguing that HUD has failed to meet its affirmative obligation to combat housing discrimination. Plaintiffs allege that HUD violated its obligations under those statutes by failing to: (1) exercise due diligence in the issuance of federally-insured mortgages; and (2) warn prospective purchasers/borrowers of a known and substantial risk to them of the dangers of falling prey to predatory selling and lending schemes.

In Vaughn I, the court held that the Administrative Procedures Act ("APA")

permits review of HUD's actions, but that the plaintiffs could not meet the rigorous standards for obtaining a mandatory permanent injunction, which requires a showing of "(1) irreparable harm and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions on the merits and a balance of hardships tipping decidedly in the movant's favor." Vaughn I, 293 F. Supp. 2d 214. HUD subsequently moved to dismiss, arguing, inter alia, that the plaintiffs lack standing to seek declaratory relief against it because they have failed to allege a sufficiently credible future injury. The court granted HUD's motion to dismiss on that ground in Vaughn III.[5] See 2006 WL 2239324, at *8-9. In that opinion, the court also granted Silver's motion for summary judgment as to the Vaughns' remaining claims against him, on the ground that they had failed to establish a prima facie case of actual injury, a common element to their claims of fraud, deceptive trade practices, and professional malpractice. The court granted that motion, finding that the plaintiffs had abandoned their claims of fraud and deceptive trade practices, and had failed to establish actual injury or damages as to the malpractice claim. See id. at 12-14. Finally, the court denied the plaintiffs' request to file a Second Amended Complaint alleging claims against the Proposed Tanen Defendants for aiding and abetting the defendants' fraudulent scheme and for deceptive trade practices, holding that the amendment would be futile because, having failed to

---

[5] HUD also moved to dismiss on the ground that the Supreme Court's decision in Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 124 S.C. 2373, 159 L.Ed.2d 137 (2004), which was decided after the court's decision in Vaughn I, called into question the court's opinion in that case that the APA permits judicial review of HUD's alleged failure to adequately scrutinize FHA mortgage applications so as to detect fraudulent or predatory lending practices. Because it found that the plaintiffs lack standing to pursue their claim against HUD, the court did not reach that issue in Vaughn III.

establish the element of actual damages arising from the underlying transaction in their case against Silver, the plaintiffs could not hope to succeed on similar claims arising from the same transaction against the Proposed Tanen Defendants. See id. at 14-15.

The plaintiffs now move for reconsideration of each aspect of the court's decision in Vaughn III. They argue that the holding granting HUD's motion to dismiss for lack of standing overlooked controlling Supreme Court and Second Circuit precedent which supports the plaintiffs' position that they have standing to seek declaratory relief on the basis of HUD's alleged failure to adequately discharge its statutory obligations, and that the court overlooked substantial evidence in the record which establishes that the plaintiffs have suffered actual damages as a result of the defendants' allegedly fraudulent scheme, requesting that the court reverse its grant of summary judgment to Silver and its denial of the plaintiffs' request to amend their complaint so as to add claims against the Proposed Tanen Defendants on that basis. HUD, Silver, and the Proposed Tanen Defendants oppose the plaintiffs' motion. HUD argues that the instant motion should be summarily denied because the cases cited by the plaintiffs in support of their argument that the court should reverse its prior order were before the court at the time it issued Vaughn III and were presumably considered by it at that time, and that, in any event, Vaughn III was correctly decided because the cases relied upon by the plaintiffs do not support the conclusion that they have standing to seek prospective relief against HUD. Silver argues that the court should deny the plaintiffs' motion as untimely because it was filed more than ten days after the Vaughn III order was entered, and that the prior order was correct that the evidence in the record fails to establish a prima facie case of actual injury. The Proposed Tanen Defendants join Silver in arguing

6

that the instant motion is untimely, and further argue that the plaintiffs cannot establish

actual damages because the substantial settlement they have already received from

other defendants makes up for any pecuniary loss they may have suffered due to the

allegedly fraudulent scheme.

## DISCUSSION

### A.    Standard of Review

Federal Rule of Civil Procedure 59(e) states simply that "[a]ny motion to alter or

amend a judgment shall be filed no later than 10 days after entry of the judgment," but

the rule "does not prescribe specific grounds for granting a motion to alter or amend an

otherwise final judgment." Munafo v. Metropolitan Transp. Authority, 381 F.3d 99, 105

(2d Cir. 2004).  The Second Circuit has held "that district courts may alter or amend a

judgment 'to correct a clear error of law or prevent manifest injustice.'" Id. (quoting

Collision v. Int'l Chem. Workers Union, Local 217, 34 F.3d 233, 236 (4th Cir.1994)); see

also Wood v. F.B.I., 432 F.3d 78, 85 n.4 (2d Cir. 2005) (affirming denial of Rule 59(e)

motion where "district court did not commit error or a manifest injustice.").  Other

circuits have taken a somewhat more expansive view of the grounds upon which a

motion to alter or amend a final judgment may be granted, holding that "[a] motion to

alter or amend the judgment is discretionary and need not be granted unless the district

court finds that there is an intervening change of controlling law, the availability of new

evidence, or the need to correct a clear error or prevent manifest injustice." Messina v.

Krakower, 439 F.3d 755, 758 (D.C. Cir. 2006) (quoting Firestone v. Firestone, 76 F.3d

1205, 1208 (D.C. Cir.1996)).[6]  The standard of review governing Rule 59(e) motions "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995).   The court shall therefore review its prior order so as to determine whether it overlooked controlling law or evidence which render the Vaughn III opinion clearly erroneous or manifestly unjust.

**B.    Timeliness of the Plaintiffs' Motion**

Defendant Silver and the Proposed Tanen Defendants argue that the plaintiffs' motion should be rejected by this court as untimely filed.  For the reasons stated below, the court rejects both arguments, and holds that the plaintiffs' motion was timely.

**1.    Plaintiffs' Motion was Timely Filed on August 24, 2006.**

As previously noted, Rule 59(e) states that "[a]ny motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment."  Local Civil

---

[6] See also Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2810.1 (1995) ("There are four basic grounds upon which a Rule 59(e) motion may be granted.  First, the movant may demonstrate that the motion is necessary to correct manifest errors of law or fact upon which the judgment is based.  Second, the motion may be granted so that the moving party may present newly discovered evidence or previously unavailable evidence.  Third, the motion will be granted if necessary to prevent manifest injustice.... Fourth, a Rule 59(e) motion may be justified by an intervening change in controlling law.").  The Second Circuit would likely hold that newly discovered evidence or an intervening change in law are appropriate grounds for a Rule 59(e) motion.  See, e.g., Lowrance v. Achtyl, 20 F.3d 529, 533 (2d Cir. 1994) (noting that a motion to reconsider on the basis of new evidence could be brought under Rule 59(e) or Rule 60(b)).  However, the extent to which the Second Circuit permits a motion for reconsideration to be based upon the discovery of new evidence or an intervening change in controlling law is of no relevance here, because the plaintiffs do not allege that they have discovered new evidence in support of their claims, or that the law has changed in any relevant respect since the court issued the Vaughn III decision.

8

Rule 6.3[7] likewise states that "[a] notice of motion for reconsideration or reargument of a court order determining a motion shall be served within ten (10) days after the entry of the court's determination of the original motion, or in the case of a court order resulting in a judgment, within ten (10) days after the entry of the judgment." Silver argues that the plaintiffs' motion should be denied because it was filed more than ten days after the entry of the August 4 Order, whereas the plaintiffs argue that the motion is timely, having been filed within ten days of the entry of judgment. Although one would ordinarily expect a clear-cut answer to the question of whether the plaintiffs' motion was made within the time allotted by the Federal Rules of Civil Procedure, certain procedural irregularities which occurred after the <u>Vaughn III</u> order was issued complicate that inquiry in this case.

As previously noted, the <u>Vaughn III</u> decision was issued on August 4, 2006. On August 18, 2006, a "Judgment," signed by the Clerk of Court, was entered in the docket. The plaintiffs filed this motion on August 24, 2006, twenty days after the August 4 order, but only six days after the judgment was entered. It would thus appear that the motion, having been filed within ten days of the entry of judgment, was timely. However, Silver argues, on the basis of Fed. R. Civ. P. 54 ("Rule 54"), that the August 18 judgment was improperly entered and therefore should be disregarded for the purpose of evaluating the timeliness of the plaintiffs' Rule 59(e) motion. Rule 54(b) states that

> [w]hen more than one claim for relief is presented in an action... the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

[7] Available at http://www.nyed.uscourts.gov/localrules.pdf.

9

If the court does not make such an express determination or direction in its order denying relief on some but fewer than all of the claims presented in the case, "any order or other form of decision... which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties." Id. Noting that the court's August 4 Order did not include an "express direction" to enter judgment, Silver surmises that "plaintiffs simply submitted a judgment to the Clerk of Court, who then entered it without any direction to do so by the Court and without any prior notice to the parties," and argues that the judgment entered on August 18 is a "nullity, as there is no authority in the Federal Rules of Civil Procedure Pursuant to which such a 'judgment' can be entered." Memorandum of Law on Behalf of Defendant Martin Silver, Esq. in Opposition to Plaintiffs' Motion for Reconsideration, dated September 7, 2006 ("Silver Mem."), at 3-4. The plaintiffs apparently concede that the August 18 judgment was not properly entered pursuant to Rule 54, but deny Silver's allegation, asserting that "[p]laintiffs neither submitted the [August 18 judgment], nor did plaintiffs direct the Clerk of the Court.... to enter said judgment. To the best of the knowledge of plaintiffs' counsel, this Court submitted the judgment." Memorandum of Law in Reply to Defendants' Memoranda in Opposition to Plaintiffs' Motion for Reconsideration Pursuant to F.R.C.P. § 59(e) and Local Rule 6.3, dated September 12, 2006 ("Reply Mem."), at 7 (emphasis in original).

If the court were to determine that the plaintiffs drafted and submitted a judgment to the Clerk of Court for entry, with no authority to do so having been granted by this court, for the purpose of evading the ten-day limitation imposed by Rule 59(e) and Local Rule 6.3, it would be inclined to deny the instant motion as untimely and to

10

entertain a motion for sanctions against the plaintiffs' counsel.  However, having

conducted its own inquiry into the matter, the court has determined that the plaintiffs

were not involved in the preparation or entry of the August 18 judgment, which resulted

from a purely internal miscommunication with the court's administrative staff.[8]  It

appears that, when the August 4 Order was sent to the District Clerk for docketing, an

administrative worker prepared and entered the judgment without a specific instruction

to do so from this court, failing to recognize that the August 4 Order did not extinguish

all claims against all parties in this action.  While it is true that the ten-day period within

which to move for reconsideration of the August 4 Order lapsed on August 14, 2006,

four days before the entry of judgment on August 18, under the circumstances the court

will accept the plaintiffs' assertion that they "were required [by the Office of the District

Clerk] to wait until the clerk docketed this Court's judgment" before filing their motion

for reconsideration.  Memorandum of Law in Reply to Memorandum of Opposition of

Proposed Defendants Jeffrey Tanen, Esq. and Bank, Tanen & Bank, P.C., dated

September 29, 2006 ("Reply Mem. II"), at 2.  Thus, the court concludes that the

---

[8] The court has found no authority specifically stating that it may take judicial notice of the administrative actions taken by its own clerical staff.  It is, however, well established that courts may take judicial notice of court records.  See, e.g., U.S. v. Bueno-Risquet, 799 F.2d 804, 811 (2d Cir. 1986); Anderson v. Rochester-Genesee Regional Transp. Auth., 337 F.3d 201, 205 n. 4 (2d Cir. 2003) (citing cases).  Moreover, the actions of the court's employees in their official capacities would appear to qualify as a judicially noticeable fact under Federal Rule of Evidence 201(b)(2), as a fact "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  This is particularly true where the court is in a better position to investigate the facts in question than the parties are.  If any of the parties have doubts about the propriety of the court's application of judicial notice in this circumstance, they may exercise their right to be heard on the issue pursuant to F.R.E. 201(e) by making an appropriate motion within ten days of the date of this order.

plaintiffs' motion, filed on August 24, 2006, was timely.

**2.      Plaintiffs' Service Upon the Proposed Tanen Defendants was Timely and Sufficient**

The Proposed Tanen Defendants argue that, regardless of whether the plaintiffs'

motion was timely filed on August 24, it should be denied as untimely because "[i]t is

undisputed that the plaintiffs did not serve the Tanen defendants until <u>September 12,</u>

<u>2006</u>, almost forty (40) days" after the August 4 Order was entered.  Memorandum of

Law in Opposition to Plaintiffs' Motion for Reconsideration ("Tanen Memorandum" or

"Tanen Mem."), at 4 (emphasis in original).  The plaintiffs respond that their service

upon the Proposed Tanen Defendants was timely and appropriate.  Because the

plaintiffs' service on August 24, 2006, was adequate as to all defendants, the court

rejects the Proposed Tanen Defendants' argument and holds that the plaintiffs' service

was timely.

 The plaintiffs filed and served the instant motion via the court's Electronic Case

Filing ("ECF") system on August 24, 2006, as required by Administrative Order 2004-

08, which states that "[b]eginning on August 2, 2004, electronic case filing will be

mandatory for all civil cases other than pro se cases and for all criminal cases."[9]  On

September 11, 2006, the Proposed Tanen Defendants' counsel, James G. Ryan, wrote to

advise the court "that at no time was this firm served with any of the plaintiffs' moving

papers in connection with this motion.  In fact, but for HUD's opposition, which I

received today... I would have had no knowledge of the motion."  Letter from James G.

Ryan, dated September 11, 2006, at 1.  In response, both by letter dated September 12,

---

[9] Available at http://www.nyed.uscourts.gov/adminorder04-08.pdf.

12

2006, and in their reply to the Tanen Memorandum, the plaintiffs correctly point out that the Proposed Tanen Defendants, as non-parties, are not entitled to service of motion papers under Fed. R. Civ. P. 5 ("Rule 5"), and that, in any event, Mr. Ryan would have been notified of the motion had he entered a Notice of Appearance on behalf of the Proposed Tanen Defendants and registered to receive notification of ECF activity in this case, which he had failed to do at the time the plaintiffs' motion was filed on August 24.[10] Rule 5 indicates that "every written motion other than one which may be heard ex parte... shall be served upon each of the <u>parties</u>." (emphasis added). The Proposed Tanen Defendants are not currently parties to this action, and it is not clear that they are entitled to service of the plaintiffs' motion papers. Moreover, even if the Proposed Tanen Defendants were entitled to service of the plaintiffs' papers, Local Civil Rule 5.2 states that "[a] paper served and filed by electronic means in accordance with procedures promulgated by the Court is, for purposes of Federal Rule of Civil Procedure 5, served and filed in compliance with the local civil rules of the Southern and Eastern Districts of New York." Mr. Ryan's failure to comply with this court's mandatory policy of electronic filing by registering to receive service of documents via the court's ECF system does not entitle him to argue that the plaintiffs' motion was untimely filed, simply because he remained unaware of it until September 11, 2006. The court therefore rejects the Proposed Tanen Defendants' argument that the plaintiffs' motion was not properly and timely served.

---

[10] The court's review of the docket indicates that Mr. Ryan <u>still</u> has not entered a Notice of Appearance or registered to receive ECF notifications in this case, even at this late date.

**C.      Reconsideration of the Court's Holding that Plaintiffs Lack Standing to Seek Declaratory or Injunctive Relief Against HUD**

The plaintiffs urge reconsideration of the court's holding in <u>Vaughn III</u> that the plaintiffs have not alleged a cognizable future injury, and therefore lack standing to seek declaratory or injunctive relief against HUD, on the ground that the court failed to consider the arguments put forth in the plaintiffs' letter brief dated December 15, 2005 ("December 15 letter"), in which they argued that the standing analysis applied by the Supreme Court in <u>Gratz v. Bollinger</u>, 539 U.S. 244, 123 S. Ct. 2411 (2003), and by the Second Circuit in <u>Comer v. Cisneros</u>, 37 F.3d 775 (1994), supports the view that the plaintiffs do have standing.  HUD urges the court to deny the plaintiffs' motion summarily, on the ground that the plaintiffs fail to provide any valid basis for reconsideration under Rule 59(e), and further argues that neither <u>Gratz</u> nor <u>Comer</u>, or the various related cases cited by the plaintiffs, support the conclusion that the plaintiffs have standing in this case.  The court finds that the plaintiffs have provided sufficient relevant authority that the court may have overlooked in its prior order, so that the instant motion should not be summarily denied, but upon examining the authority cited by the plaintiffs in their December 15 letter and their memorandum of law in support of the instant motion, the court concludes that the plaintiffs have not established that the court's holding in <u>Vaughn III</u> was clearly erroneous or manifestly unjust in its determination that the plaintiffs lack standing to pursue their claims against HUD.

**1.      Plaintiffs' Motion Shall not be Summarily Denied**

In opposition to the plaintiffs' motion for reconsideration, HUD first argues that, because the plaintiffs' arguments concerning <u>Gratz</u> and <u>Comer</u> were submitted to the

court in their December 15 letter, after oral argument was heard on HUD's motion to dismiss but before the court issued its ruling on that motion, the court should summarily deny the plaintiffs' motion because "[t]hese arguments were already before the Court at the time it rendered its August 4, 2006, decision, and because they have presumably already been considered by the court."  Defendant HUD's Memorandum in Opposition to Plaintiffs' Rule 59(e) Motion to Alter or Amend Judgment ("HUD Mem."), at 2 (citing Suvulj v. United States, No. 98-cv-5550, 2003 WL 22078051, at *1 (E.D.N.Y. September 5, 2003); Belmont v. Associates Nat'l Bank (Delaware), 219 F. Supp. 2d 340, 342 (E.D.N.Y. 2002); Shrader, 70 F.3d at 257).  While it is true that "[a] Rule 59(e) motion… 'may not be used to relitigate old matters, or raise arguments…  that could have been raised prior to the entry of judgment,'" none of the cases cited by HUD support the proposition that a motion for reconsideration must be denied simply because the cases or arguments that the court is alleged to have overlooked were before it when it issued its initial ruling– indeed, such a holding would defy the generally accepted meaning of the word "overlooked."  Bonded Concrete, Inc. v. D.A. Collins Constr. Co., 29 Fed. Appx. 725, 726 (2d Cir. 2002) (quoting Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2810.1 (1995)).  In Suvulj, the district court denied the motion for reconsideration not simply because the cases cited by the defendants in support of that motion were before the court when it initially ruled, but rather because the court had "fully considered the Second Circuit decisions relied upon by defendants" in its initial ruling.  Suvulj, 2003 WL 22078051, at *1.  In Shrader, the Second Circuit cautioned that "a motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided," but affirmed the

district court's decision to reconsider its initial order "in light of CSXT's introduction of additional relevant case law and substantial legislative history." Shrader, 70 F.3d at 257. However, Shrader does not hold that a litigant must introduce relevant authority that was not before the district court when it initially ruled on the matter; it merely holds that the introduction of substantial new material is a sufficient ground for granting a motion for reconsideration. Finally, Belmont actually undermines HUD's position, in that the district court there proceeded to the merits of the motion for reconsideration, over the defendant's objection that the plaintiff was seeking to relitigate issues already presented to and decided by the court in prior orders, because "Belmont's full arguments on the merits raise legal questions that were not previously considered in these proceedings. Therefore, his motion for reconsideration is not a relitigation of old issues." Belmont, 219 F. Supp. 2d at 343. Because there is no indication in Vaughn III that the court considered the arguments presented in the plaintiffs' December 15 letter, the court will address those arguments here.

## 2.   The Equal Protection Analysis of *Gratz* and *Comer* is Inapplicable to the Instant Case

The plaintiffs argue that, in evaluating whether they had alleged an injury in fact sufficient to establish standing to seek prospective relief against HUD, the court should have applied the standing analyses articulated by Gratz and Comer to the question of the plaintiffs' allegation of future injury, rather than the analyses of the Supreme Court's decisions in City of Los Angeles v. Lyons, 461 U.S. 95, 103 S. Ct. 1660 (1983) and O'Shea v. Littleton, 414 U.S. 488, 94 S. Ct. 669 (1974), and the Second Circuit's decision in Shain v. Ellison, 356 F.3d 211 (2d Cir. 2004), upon which the court's prior order

primarily relied. Their argument rests on the premise that in <u>Gratz</u>, the Supreme Court "essentially adopted the Second Circuit [standing] test in <u>Comer</u>," Pl. Mem. at 9, and that the <u>Gratz</u> decision therefore "substantially relaxed the rigid strictures regarding standing imposed by <u>City of Los Angeles v. Lyons</u>." <u>Id.</u> at 7. The court rejects that characterization of <u>Gratz</u>. The <u>Gratz</u> opinion did not adopt a new standard by which to evaluate standing; to the contrary, both <u>Gratz</u> and <u>Comer</u> rely upon an established body of Supreme Court authority that antedates <u>Lyons</u>, but is applicable to an entirely different set of standing questions. Therefore, the <u>Gratz</u> opinion did not "relax" or in any way affect the Court's holding in <u>Lyons</u>. Because the court finds that the plaintiffs' case fits more comfortably within the line of cases represented by <u>Lyons</u> rather than those represented by <u>Gratz</u> and <u>Comer</u>, the plaintiffs' motion for reconsideration of this court's determination in <u>Vaughn III</u> that they lack standing to pursue their claims against HUD is denied.

### a. **Summary of Standing Analysis Applied by *Gratz* and *Comer***

In order to understand why the standing analysis of <u>Gratz</u> and <u>Comer</u> is inapplicable to the plaintiffs' situation, it is necessary to examine those cases in some detail. <u>Comer v. Cisneros</u>, which is superficially quite similar to this case, involved a class action on behalf of low-income, minority residents of public housing projects in Buffalo, New York, and applicants for federal housing assistance in Erie County, New York, alleging a pattern of racial discrimination against HUD and several local Public Housing Agencies ("PHAs") in their administration of the Section 8 Existing Housing Program, a public-assistance housing program which operates pursuant to the Housing

17

and Community Development Act of 1974, 42 U.S.C. § 1437f.[11]   The details of the

regulatory scheme and the facts underlying the case are complicated, but in essence,

each PHA operated as a regional administrator for the Section 8 program by overseeing

the distribution of HUD-backed Section 8 certificates, which provided housing subsidies

to low-income individuals, thereby helping those individuals afford to live in privately-

owned housing rather than in public projects. Prior to July 2, 1990, an individual who

obtained a Section 8 certificate from a PHA could only use that certificate for housing

within the geographic boundaries of that PHA's jurisdiction, which were roughly

coextensive with the boundaries of the municipal authority in which the PHA was

located; thus, families who lived within the city of Buffalo and obtained a Section 8

certificate from defendant Rental Assistance Corporation of Buffalo ("RAC"), the PHA

which administered the Section 8 program for the city, could use that certificate only for

housing within the city of Buffalo, not for housing in the surrounding suburban areas.[12]

On July 2, 1990, HUD directed all Section 8 PHA administrators to notify the recipients

of Section 8 certificates that those certificates could be used to procure housing either

within the geographical area subject to the jurisdiction of the PHA from whom they

_____

[11] The court's summary of the facts underlying Comer is taken from the
"Background" section of that opinion.  See 37 F.3d at 780-784.  Some details of the
Section 8 program not necessary for understanding the standing issue and the Second
Circuit's analysis have been omitted or simplified.  Other aspects of the opinion,
involving claims unrelated to the Section 8 program and the plaintiffs' standing, have
been omitted entirely from this summary.

[12] Although an alternative Section 8 "voucher" program existed, which, unlike the
certificate program, would permit residents of the city of Buffalo to obtain subsidized
housing in the suburbs, the plaintiffs argued that RAC and HUD failed to inform many
eligible applicants of the existence of the voucher program, directing them instead to the
certificate program and informing them that they must use their Section 8 certificates
within the Buffalo city limits.

obtained the certificate, or within a contiguous geographical area; however, the members of the class action alleging claims against RAC (the "RAC plaintiffs") alleged that RAC failed to notify recipients of Section 8 certificates of their ability to move outside of the city of Buffalo, and that it continued to misleadingly inform them that the certificates could be used only to procure housing within the city limits.

Supply of Section 8 certificates was never sufficient to meet demand, so a long waiting list for the certificates existed, and eligible families could wait years to receive one. In order to efficiently manage the distribution of Section 8 certificates, Congress and HUD set up a system of selection priorities, pursuant to which the neediest families were assigned a higher place on the waiting list than individuals who did not meet the priority selection criteria.[13] PHAs were also permitted, subject to certain restrictions, to implement their own local preferences for the purpose of prioritizing the applications of the families who qualified for a federal preference; however, PHAs could not assign a higher priority to a family that did not qualify for a federal preference than to a family that did qualify for such a preference on the basis of a local preference. Defendant PHA Belmont Shelter Corporation ("Belmont"), which administered the Section 8 program for the town of Amherst and other suburban communities outside the city of Buffalo, adopted a local preference in favor of applicants who lived or worked in one of the

---

[13] Specifically, the statutory and regulatory system assigned priority to three groups: "(1) families who occupy substandard housing; (2) families who are involuntarily displaced; and (3) families who are paying more than 50 percent of family income for rent." Comer, 37 F.3d at 781 (citing 42 U.S.C. § 1437f(o)(3); 24 C.F.R. §§ 882.219, 887.157 (1993)).

suburban communities within Belmont's administrative jurisdiction.[14]

In their class action, the plaintiffs alleged a plethora of claims against, inter alia, HUD, RAC, and Belmont, on the basis of the Equal Protection Clause of the Fourteenth Amendment to the federal Constitution and a number of federal statutes, including the FHA.  The plaintiffs' allegations included, inter alia, 1) that the Section 8 certificate program violated the plaintiffs' constitutional and statutory rights in that it acted as a barrier to the movement of minority and low-income individuals from the city of Buffalo into the more affluent suburbs, 2) that RAC's failure to inform minority recipients of Section 8 certificates of the existence of the voucher program, pursuant to which they could be eligible for subsidized housing in the suburbs, and its failure, after July 2, 1990, to notify certificate holders that their certificates could be used for housing outside the Buffalo city limits, violated the plaintiffs' constitutional and statutory rights in that the practice "erected a barrier that makes it more difficult for economically disadvantaged blacks to obtain a housing benefit than it is for non-minorities," id. at 791, and that the failure to provide such information "was intentional and harmed those individuals who subsequently failed to find housing in the suburbs," id.,  and 3) that Belmont's local preference in favor of individuals who lived or worked in the suburban communities within its jurisdiction violated the plaintiffs' constitutional and statutory rights in that it "impedes persons who live in the City of Buffalo, which has a higher percentage minority population than the suburbs, from obtaining rental assistance available under Belmont's

---

[14] Belmont's preference system divided applicants into four groups of decreasing priority, as follows: "(1) applicants who claim both a federal and a local preference, (2) applicants who claim only a federal preference, (3) applicants who claim only a local preference, and (4) applicants who do not claim any preference."  Id. at 784.

program, thereby giving subsidies to a disproportionate number of white suburban residents ahead of minority city dwellers." Id. at 792. The plaintiffs sought declaratory and injunctive relief terminating the allegedly discriminatory practices in the defendants' administration of the Section 8 program. The district court dismissed the action in its entirety, holding, inter alia, that the plaintiffs lacked standing to pursue their claims against HUD and the PHAs. The Second Circuit vacated the district court's holding, determining that the plaintiffs had standing under the Constitution and under the FHA to challenge the allegedly discriminatory practices.

The Comer court distinguished between the plaintiffs' constitutional claims and their statutory claims in its standing analysis, but held that the plaintiffs had standing to sue HUD, RAC, and Belmont under both the FHA and the Equal Protection Clause. The court noted that plaintiffs can establish standing to sue more readily under the FHA than under the Constitution, because the standing analysis under the FHA focuses only on the "constitutional minima" of injury-in-fact, causation, and redressability, and excludes the "prudential" concerns by which a court may determine that a plaintiff lacks standing to pursue a constitutional claim even where the constitutional minima are satisfied. See id. at 787 (discussing general principles of standing, including constitutional minima and prudential concerns), 789 ("[t]o the extent that the plaintiffs' claims invoke the FHA, we need only examine the constitutional minima of injury, causation, and redressability"), 795 ("[w]e need not address the question of prudential concerns as they do not apply to standing under the FHA."); cf. id. at 790 ("[t]he case for standing on constitutional claims is more difficult only because we must consider not only the three constitutional minima but also any prudential reasons for

21

denying standing.").  The court held that the RAC plaintiffs had standing under the FHA to seek injunctive relief against RAC, because RAC allegedly "(1) has denied [the RAC plaintiffs] the benefits of the Section 8 program, (2) has excluded [the RAC plaintiffs] from participation in these programs, and (3) has subjected [the RAC plaintiffs] to racial discrimination in violation of the FHA and applicable civil rights laws."  Id. at 790.  In considering the standing of the members of the class action seeking declaratory and injunctive relief against Belmont (the "Belmont plaintiffs"), who argued that Belmont's local preference encouraged segregation and favored the distribution of federal assistance to white suburbanites over minority city dwellers, the court determined that in order to establish standing under the FHA,

> all that any specific plaintiff must show is that (1) the application of the local residency preference has a disparate impact on minority residents of the City of Buffalo, (2) he or she is a member of the class harmed by the application of the local residency preference that is being denied the benefits accorded under the U. S. Housing Act because of Belmont's application of the local preference and (3) he or she applied for and was denied housing.

Id. at 795.  Finding that the Belmont plaintiffs had alleged each of these facts, the court concluded that they had standing under the FHA to seek injunctive relief against Belmont.

The Comer court also determined that both sets of plaintiffs had standing to pursue their constitutional claims against RAC and Belmont.  The RAC plaintiffs' constitutional argument rested on their assertion that, by failing to adequately inform the recipients of Section 8 certificates of the fact that those certificates could be used outside the Buffalo city limits, RAC violated the plaintiffs' rights under the Equal Protection Clause by creating a situation in which minorities were at a systematic

disadvantage in seeking federal housing benefits vis-à-vis non-minorities.  The court concluded that the RAC plaintiffs had alleged an injury-in-fact sufficient to establish standing to seek injunctive relief by their contention "that RAC rules and regulations, <u>in their administration</u>, violate the Constitution because they erect a barrier that makes it more difficult for economically disadvantaged blacks to obtain a housing benefit than it is for non-minorities."  <u>Id.</u> at 791 (emphasis in original).  Turning to the Belmont plaintiffs' claim that Belmont's local preference unconstitutionally impeded the ability of minority residents of the city of Buffalo to compete with non-minority suburban dwellers for federal housing benefits, the court determined that, in order to establish standing to pursue an Equal Protection claim of the type alleged by the Belmont plaintiffs, "a plaintiff must allege that (1) there exists a reasonable likelihood that the plaintiff is in the disadvantaged group, (2) there exists a government-erected barrier, and (3) the barrier causes members of one group to be treated differently from members of the other group."  <u>Id.</u> at 793 (citing <u>Northeastern Florida Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville</u>, 508 U.S. 656 (1993)).  The court first addressed Belmont's argument that, because neither of the Belmont plaintiffs qualified for a federal preference, and in light of the fact that, due to the volume of applications for Section 8 assistance and the relative scarcity of available funds, "an applicant who does not qualify for the federal preference as a practical matter would never be offered assistance," the Belmont plaintiffs could not establish standing because, even in the absence of the local preference, they would never actually receive Section 8 assistance.  <u>Comer</u>, 37 F.3d at 783.  The court rejected Belmont's argument, holding that

the injury to the Belmont plaintiffs cannot be defeated by showing that, as a practical matter, the plaintiffs would never receive housing assistance anyway. The injury is not the failure to obtain housing assistance in the suburbs, but it is the missed opportunity to compete for suburban housing on an equal footing with the local residents.

Id. at 794. It then concluded that both Belmont plaintiffs "allege facts sufficient to demonstrate the constitutional minima" of injury-in-fact, causation, and redressability, and that no prudential reasons existed to deny standing to the Belmont plaintiffs. The court then concluded that "both [Belmont] plaintiffs have standing to sue the Belmont defendants on equal protection claims." Id.

The facts underlying the Supreme Court's opinion in Gratz v. Bollinger are significantly less complex. Two Caucasian students who applied for and were denied undergraduate admission to the University of Michigan ("University") filed a class action against the University, alleging that its reliance upon an applicant's race in making admissions decisions, in a manner which favored members of racial or ethnic groups deemed by the university to be "underrepresented minorities," violated the equal protection rights of the plaintiffs and of all other non-minority applicants to the University. See Gratz, 539 U.S. at 251-257. The element of race was dispositive in the University's decision to deny admission to both plaintiffs, as their applications fell within a range in which, but for their status as non-minority applicants, they would have been admitted to the University. The district court granted in part and denied in part both parties' motion for summary judgment, and permitted an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The Sixth Circuit heard oral argument en banc, but the Supreme Court granted certiorari before the appellate court had ruled on the parties'

appeals.[15]

       Although the parties did not raise the issue of standing at any stage of the proceedings, the <u>Gratz</u> majority responded to an argument by Justice Stevens, writing in dissent, that one plaintiff lacked standing because there was "no evidence that [the plaintiff] ever actually applied for admission as a transfer student at [the University of] Michigan[, h]is claim for future injury is at best 'conjectural or hypothetical' rather than 'real and immediate.'" <u>Gratz</u>, 539 U.S. at 285-286 (Stevens, J., dissenting) (quoting <u>O'Shea</u>, 414 U.S. at 494.). The majority rejected Justice Stevens's application of Article III, holding that the student's alleged intent to apply to the University as a transfer student when it changed its race-conscious admissions policy was sufficient to satisfy the injury-in-fact requirement as applied to an equal protection challenge. <u>See id.</u> at 261 ("[i]t is well established that intent may be relevant to standing in an equal protection challenge."). The Court further held that the plaintiff had standing to challenge the University's admissions program because he "alleged that the University had denied him the opportunity to complete for admission on an equal basis" with applicants who enjoyed favorable treatment due to their status as underrepresented minorities. <u>Gratz</u>, 539 U.S. at 261 (citing <u>Jacksonville</u> for the proposition that "[t]he 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the [governmental] barrier, not the ultimate ability to obtain the

---

[15] The Supreme Court took this unusual step so that it might consider the case alongside its review of the Sixth Circuit's ruling in <u>Grutter v. Bollinger</u>, which concerned an equal protection challenge to the race-conscious admissions system employed by the University of Michigan Law School. <u>See</u> <u>Grutter v. Bollinger</u>, 539 U.S. 306, 329, 123 S. Ct. 2325, 156 L. Ed. 2d 304 (2003).

benefit.").

### b.    *Gratz* and *Comer* do not Apply to the Instant Case.

HUD argues that the standing analysis in Gratz and Comer does not apply in this case because the standard applied by those opinions "is for claims that a plaintiff's constitutional due process and equal protection rights have been violated, not for federal statutory claims, as fielded by Plaintiffs here." HUD Mem. at 2 (emphasis in original). However, Comer addressed claims brought under both the Equal Protection Clause and the FHA; moreover, it indicated that the standing analysis for FHA claims is broader than the analysis for equal protection claims. See Comer, 37 F.3d at 789 ("with respect to the FHA claims, we accord the RAC plaintiffs... the broadest possible grounds for standing"), 795 ("[w]e need not address the question of prudential concerns as they do not apply to standing under the FHA."). HUD's argument is therefore incorrect in its particulars, but correct in spirit– the operative distinction between the Gratz and the line of cases preceding it, including but not limited to Comer, and this case is not that the former addressed constitutional claims and the latter raises only statutory ones, but that the Gratz  line of cases addresses a different situation than the one presented here, so that the standing analysis applied by those cases simply does not apply outside of the factual context in which it was developed.

As noted above, the plaintiffs argue that the Supreme Court's opinion in Gratz adopted the standing test that they suggest was first developed by the Second Circuit in Comer, thereby relaxing the principles of standing applied by earlier cases such as City

of Los Angeles v. Lyons.[16]  Contrary to the plaintiffs' assertions, the Supreme Court's

opinion in Gratz did not "loosen," or alter in any way whatsoever, the Court's application

of the standing doctrine in Lyons.  Instead, Gratz simply applied an alternative

formulation of the Article III "case or controversy" requirement that was first articulated

in its current form in Northeastern Florida Chapter of the Associated Gen. Contractors

of Am. v. City of Jacksonville, 508 U.S. 656 (1993), but is derived from three earlier

cases– Turner v. Fouche, 396 U.S. 346, 90 S. Ct. 532, 24 L. Ed. 2d 567 (1970); Clements

v. Fashing, 457 U.S. 957, 102 S. Ct. 2836, 73 L. Ed. 2d 508 (1982); and Regents of the

University of California v. Bakke, 438 U.S. 265, 98 S. Ct. 2733, 57 L. Ed. 2d 750 (1978) –

that antedate the Court's decision in Lyons.[17]  See Jacksonville, 508 U.S. at 664-666

(discussing Turner, Clements, and Bakke).  Jacksonville involved an equal protection

---

[16] Lyons involved a plaintiff who alleged that, during a traffic stop, officers of the
Los Angeles Police Department placed the plaintiff in a "control hold," "rendering him
unconscious and causing damage to his larynx."  Lyons, 461 U.S. at 97-98.  The plaintiff
thereafter sued the city, seeking, inter alia, "a [declaratory] judgment that use of
chokeholds absent the threat of immediate use of deadly force is a per se violation of
various constitutional rights" and an injunction against the use of such holds.  Id. at 98.
The Supreme Court reversed a preliminary injunction in favor of the plaintiff, holding
that the plaintiff lacked standing to seek declaratory or injunctive relief against the city
for a past injury that was unlikely to recur in the future.  The Lyons Court held that, in
order to allege a future injury sufficiently definite to establish standing to seek
prospective relief, the plaintiff "would have had not only to allege that he would have
another encounter with the police but also to make the incredible assertion either (1)
that all police officers in Los Angeles always choke any citizen with whom they happen
to have an encounter... or, (2) that the City ordered or authorized police officers to act in
such manner."  Id. at 105-106 (emphasis in original).  The plaintiffs' exclusive focus on
Lyons is curious, because the court's opinion in Vaughn III relied more extensively on
O'Shea v. Littleton and Shain v. Ellison than on Lyons.  However, the court's rejection of
the plaintiffs' argument that Gratz implicitly repudiated the standing analysis applied by
earlier cases is equally valid with respect to all of the cases upon which its earlier order
relied.

[17] As previously noted, both Gratz and Comer cited Jacksonville as the source of
their standing analysis.

challenge by an association of general contractors to a city ordinance requiring that 10% of the amount spent on city contracts each fiscal year be set aside for so-called "Minority Business Enterprises." 508 U.S. at 658. The Supreme Court determined that, although none of the plaintiffs could allege with certainty that they would have been awarded those city contracts but for the operation of the set-aside program,

> [w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

Id. at 666. The Court further held that "[i]n the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract," and held that, in order to establish standing in this situation, "a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." Id. The Jacksonville Court's formulation of the standing inquiry is essentially identical to that applied by Gratz and Comer, and belies the plaintiffs' assertion that the Court adopted a new rule of standing in Gratz.[18]

---

[18] The plaintiffs cite three recent cases—Norflet v. John Hancock Fin. Servs., Inc., 422 F. Supp. 2d 346, 352-53 (D. Conn. 2006); Save Our Schools— Southeast & Northeast v. District of Columbia Board of Education, No. 04-1500, 2006 WL 1827654, at *4 (D.D.C. July 3, 2006); and Friery v. Los Angeles Unified School District, 448 F.3d 1146, 1148 (9th Cir. 2006)— in support of their argument that the Gratz decision modified the principles of standing as stated in Lyons. The plaintiffs' assertion that these cases "recognize that the decision in Gratz clearly affected the test by which standing is determined in race discrimination" is disingenuous at best. Pl. Mem. at 8. Norflet actually demonstrates that the Gratz Court was merely applying the Jacksonville analysis, without alteration or modification. The Norflet court cited both Jacksonville

The foregoing examination of the history of the <u>Gratz</u> test illustrates why it is inapplicable to this case. Like <u>Gratz</u> and <u>Comer</u>, <u>Jacksonville</u> and all of the cases upon which it relied involve situations in which some government policy allegedly acts as an impediment to a discrete class of individuals in competition for some government-sponsored benefit by precluding them from competing for the benefit on an equal footing with other applicants. The plaintiffs implicitly acknowledge this factual dissimilarity when they argue that HUD's alleged failure to adequately review FHA mortgage insurance applications constitutes a "barrier" which impedes minority homebuyers' ability to compete on equal footing with other applicants for the government benefit of FHA mortgage insurance. The plaintiffs' efforts to characterize this case as similar to <u>Gratz</u> and <u>Jacksonville</u> fail for several reasons. Although FHA mortgage insurance can plausibly be deemed a government benefit, the plaintiffs do not allege that HUD's failure to adequately review applications for such insurance creates a barrier in any real sense to any plaintiff's ability to obtain that benefit. To the contrary, the plaintiffs allege that HUD, by failing to detect fraudulent statements or predatory practices in FHA mortgage

and <u>Gratz</u> in the same paragraph in its general discussion of standing, and cited the former case much more frequently than the latter throughout its opinion, thus implying that it viewed <u>Jacksonville</u> as the controlling case. Moreover, far from suggesting that the <u>Gratz</u> opinion limited or modified the holding of <u>Lyons</u>, <u>Norflet</u> does not discuss, or even cite, the <u>Lyons</u> opinion. Both <u>Save Our Schools</u> and <u>Friery</u> cite <u>Gratz</u> without reference to <u>Jacksonville</u> or <u>Lyons</u>, which is unsurprising as both of those cases address allegations of racially discriminatory practices at educational institutions in violation of, <u>inter alia</u>, the plaintiffs' equal protection rights, and as such are most factually similar to <u>Gratz</u>. None of these cases support the plaintiffs' theory that <u>Gratz</u> implicitly overruled or limited <u>Lyons</u>, nor are they inconsistent with this court's view that the <u>Jacksonville</u>/<u>Gratz</u> line of cases simply apply the Article III injury-in-fact analysis to a different factual context, namely, to situations in which plaintiffs allege that a governmental practice or policy has the effect of creating a discriminatory barrier which prevents them from competing on equal footing for some government benefit.

applications, awards the relevant benefit too readily, thereby facilitating the predatory

lending and flip-selling schemes of unscrupulous lenders by granting applications which

allegedly should be denied.  Additionally, it is unclear with whom the plaintiffs are

unable to compete on an equal footing, as the plaintiffs do not allege that HUD applies a

different level of review to applications for FHA mortgage insurance by non-minority

applicants than it does to applications by minority applicants.  Even if, as the plaintiffs

suggest, HUD's policies regarding the review of FHA mortgage applications fall below

some objective standard of reasonableness and create an increased risk that the

applicants will fall victim to predatory or fraudulent lending schemes, this increased risk

would apply equally to all applicants in a given geographic region, and therefore would

not create a situation of unfair competition, which was central to the standing analysis

applied by Gratz, Comer, and Jacksonville.  Finally, the plaintiffs do not allege that

applicants "compete" for FHA mortgage insurance at all, in the sense that it is a scarce

resource that is awarded by the government to some eligible individuals but denied to

others.  Neither the Vaughn complaint nor the Banks complaint sets forth in detail the

process by which HUD evaluates applications for FHA mortgage insurance, other than to

allege that the review process fails to adequately scrutinize such applications for evidence

of fraud or predatory practices.  See Vaughn 1st Am. Compl. ¶¶ 153-160;  Banks 2d Am.

Compl. ¶¶ 80-90.  Their complaints include no allegation that the demand for FHA

mortgage insurance by qualified applicants exceeds the supply of available funding, or

that qualified applicants compete with each other for FHA mortgage insurance in the way

that eligible families competed for Section 8 assistance in Comer or students competed

for a finite number of seats in the University of Michigan's undergraduate program in

<u>Gratz</u>.  These factual distinctions demonstrate that the standing analysis applied by

<u>Gratz</u>, <u>Comer</u>, and <u>Jacksonville</u> to situations in which a government policy has the effect

of imposing a discriminatory burden on some subset of applicants for a government

benefit is simply not applicable to the facts of this case.

      The plaintiffs acknowledge that the cases in which the standard articulated by

<u>Gratz</u>, <u>Comer</u>, and <u>Jacksonville</u> is applied "often involve competitive bidding or other

relationships wherein one competitor is put at a disadvantage," but insist that "there is

no rational basis for limiting these rulings solely to such situations."  December 15 letter

at 3.  The plaintiffs fail to acknowledge the obvious "rational basis" for restricting the

<u>Gratz</u>/<u>Jacksonville</u> analysis to cases of direct competition: the concept of "equal footing"

has no logical application outside of that context.  The court cannot conceive of what it

might mean to say that a government "barrier" prevents applicants from "competing" on

"equal footing," in a situation where no competition exists.  The court's interest in

avoiding the adoption of an unintelligible standard of adjudication is surely a rational

basis for restricting the <u>Jacksonville</u>/<u>Gratz</u> test to the factual context in which it has

historically been applied.  The plaintiffs' motion to reconsider the court's prior order,

dismissing the plaintiffs' claims against HUD for lack of standing, is therefore denied.[19]

_____

[19] The plaintiffs request that, if the court determines that the <u>Gratz</u> analysis does not apply to their claims because they are brought under the FHA rather than the Equal Protection Clause, they be permitted to amend their complaint to add a claim arising under the Equal Protection Clause.  Reply Mem. at 5-6.  The plaintiffs' request is denied as futile.  Even if they were to allege an equal protection claim, the <u>Gratz</u> analysis would not apply to the issue of their standing because this is not a situation in which a government program allegedly imposes a discriminatory barrier on individuals competing for a government benefit.  The court further notes that the plaintiffs have already filed a Notice of Appeal, which has been stayed pursuant to Fed. R. App. P. 4(a)(4) pending the outcome of this motion.  On appeal, the court suggests that both

**D.**  **Reconsideration of the Court's Grant of Summary Judgment in Favor of Defendant Silver**

The court granted Silver's motion to dismiss the Vaughns' third cause of action against him, alleging breach of fiduciary duty, in <u>Vaughn II</u>.  <u>See</u> 2003 WL 21241669, at *8.  In <u>Vaughn III</u>, the court granted summary judgment to Mr. Silver as to the remaining claims against him, which alleged fraud, professional malpractice, and deceptive trade practices.  The court held that the Vaughns had abandoned their claims of fraud and deceptive trade practices, and that Silver was entitled to summary judgment as to the professional malpractice claim because the Vaughns could not establish that they had suffered actual damages traceable to the defendant's alleged malpractice.  <u>See</u> 2006 WL 2239324, at *12-14.  The Vaughns now urge reconsideration of the court's grant of summary judgment, arguing that they did not abandon any claims against Silver in their opposition to his motion for summary judgment, and that the court erred in determining that the Vaughns had failed to provide evidence of actual damages sufficient to establish a <u>prima facie</u> case.  For the reasons stated below, the court concludes that its earlier holding to the effect that the Vaughns had abandoned their claims of fraud and deceptive trade practices was clearly erroneous, and reverses that holding.  However, the

---

parties might address the question of whether the Second Circuit's decision in <u>Baur v. Veneman</u>, 352 F.3d 625, 634 (2d Cir. 2003), which held that the plaintiff had standing on the basis of the increased risk of injury created by the United States Department of Agriculture's alleged failure to regulate the use of downed livestock for human consumption in conformity with its statutory obligations, but which expressly limited its holding to "the specific context of food and drug safety suits," applies to the plaintiffs' argument that HUD's failure to adequately review FHA mortgage applications creates an increased risk to minority and low-income home buyers of falling victim to fraudulent or predatory lending practices.

court affirms its grant of summary judgment to Silver as to the legal malpractice claim on the ground that the plaintiffs have failed to provide evidence of actual damages to which they might be entitled under any theory consistent with their allegations.  Because actual damages are a necessary element of the plaintiffs' claims for fraud and deceptive trade practices, the court grants summary judgment to Silver on those claims as well.

### 1. Plaintiffs did not Abandon Their First and Seventh Causes of Action Against Silver

The court's August 4 Order concluded that, because the Vaughns' submission in opposition to Silver's motion for summary judgment did not address their first and seventh causes of action, alleging 1) common-law fraud, and 2) deceptive business practices in violation of N.Y. Gen. Bus. Law § 349, against Mr. Silver, that they had abandoned those claims, and granted summary judgment on that basis.  See Vaughn II, 2006 WL 2239324, at *12 (citing City of New York v. Minetta, 262 F.3d 169, 181 (2d Cir. 2001); General Motors Corp. v. Villa Marin Chevrolet, Inc., Nos. 98-CV-5206 (JG), 98-CV-5208 (JG), 98-CV-6167 (JG), 99-CV-3750 (JG),  2000 WL 271965, at *14 (E.D.N.Y. March 7, 2000)).  In their memorandum of law in support of this motion, the Vaughns argue that the court's conclusion that they had abandoned those claims was mistaken, pointing out that "their response was explicitly addressed to the damages they suffered as a result of Silver's fraudulent misrepresentations that induced them to consummate the purchase of the subject property in a dilapidated condition that was unlawful for occupancy."  Pl. Mem. at 9 n. 5.  On reconsideration, the court concludes that its prior determination that the Vaughns had abandoned these claims was clearly erroneous.  Although the Vaughns' "21-Day Demand Pursuant to FRCP Rule 11(c)(1)(A)

to Withdraw Defendant Martin Silver's Motion for Summary Judgment," dated August 9, 2005 ("Rule 11 letter"), which they later incorporated by reference in opposition to Silver's motion for summary judgment,[20] did not make specific reference to any of the Vaughns' remaining claims against Silver, it did challenge Silver's argument that the plaintiffs had failed to establish actual damages, a common element of all of their claims against him.  The court concludes that <u>Vaughn III</u> was clearly erroneous and manifestly unjust in concluding that the Vaughns had abandoned two of their three claims against Silver simply because their opposition papers did not explicitly refer to those claims, when those papers did challenge the basis upon which Silver sought summary judgment as to all three claims.  Thus, the court grants the plaintiffs' motion for reconsideration of its prior order insofar as it held that defendant Silver was entitled to summary judgment as to the plaintiffs' first and seventh causes of action on the ground that they had abandoned those claims.[21]

---

[20] <u>See</u> Declaration of Richard J. Wagner, Esq., in Opposition to Motion for Summary Judgment, dated August 24, 2005 (incorporating Rule 11 letter by reference).

[21] Although it grants this aspect of the plaintiffs' motion for reconsideration in the interests of justice, the court notes that its confusion regarding the extent to which the Vaughns opposed Silver's motion for summary judgment was due in part to the method by which the plaintiffs chose to respond in opposition to that motion.  In response to Silver's motion, the plaintiffs filed the aforementioned Rule 11 letter on August 9, 2005.  In that letter, the plaintiffs demanded that Silver retract his motion for summary judgment, and stated that "[i]f you have not withdrawn your motion within twenty-one days of this date, we will interpose our opposition on the scheduled date of August 24, 2005."  Rule 11 letter at 1.  On August 24, the Vaughns submitted the aforementioned Declaration of Richard J. Wagner, a one-page document which simply attached a number of lengthy deposition transcripts as exhibits, and incorporated the Rule 11 letter by reference.  The plaintiffs did not file a memorandum of law in opposition to Silver's motion for summary judgment, and the five-page Rule 11 letter, which simply disputes certain factual allegations contained in Silver's motion for summary judgment (and, as the court noted in <u>Vaughn III</u>, does not constitute a separate statement of disputed issues of material fact as required by Local Rule 56.1), is hardly the clear and direct

## 2.     **Summary Judgment for Silver is Warranted as to All Claims**

Although the court erred in holding that the Vaughns had abandoned their claims for fraud and deceptive trade practices against Silver, it nevertheless finds, on reconsideration, that summary judgment in favor of Silver is appropriate as to those claims because the plaintiffs have failed to provide evidence of any actual damages arising from his conduct sufficient to establish a <u>prima facie</u> case.  The court also denies the plaintiffs' motion for reconsideration of its grant of summary judgment to Silver as to the professional malpractice claim for the same reason.

The element of actual damages is common to each of the plaintiffs' claims against Silver.  <u>See</u>, <u>e.g.</u>, <u>New York Univ. v. Continental Ins. Co.</u>, 87 N.Y.2d 308, 318 (1995) (elements of fraud under New York law are "representation of a material existing fact, falsity, scienter, deception and injury," also holding that § 349 requires that plaintiff show actual damages);  <u>Donahue v. Ferolito, Vultaggio & Sons</u>, 13 A.D.3d 77, 78 (1st Dep't 2004) (affirming dismissal of § 349 claim for failure to establish actual damages); <u>Between the Bread Realty Corp. v. Salans Hertzfeld Heilbronn Christy & Veiner</u>, 290 A.D.2d 380, 381 (1st Dep't 2002) (legal malpractice requires showing of (1) negligence of the attorney, (2) that was the proximate cause of the loss sustained, and (3) proof of actual damages) (citing <u>Prudential Ins. Co. of America v. Dewey, Ballantine, Bushby,</u>

---

response that the court would expect to receive in opposition to a dispositive motion. Although, when entertaining a motion for summary judgment, "the Court is obligated to search the record and independently determine whether or not a genuine issue of fact exists," the burden of that obligation is considerably exacerbated by the plaintiffs' failure to adequately address the issues presented in Silver's motion for summary judgment in an appropriate manner.  <u>Jiminez v. Dreis & Krump Mfg. Co., Inc.</u>, 736 F.2d 51, 53 (2d Cir. 1984) (quoting <u>Higgins v. Baker</u>, 309 F. Supp. 635, 639 (S.D.N.Y. 1970)).

Palmer & Wood, 170 A.D.2d 108, 114 (1991); aff'd 80 N.Y.2d 377 (1992)); Keywell Corp.

v. Piper & Marbury L.L.P., 51 Fed. Appx. 337, 341 (2d Cir. 2002) (affirming summary

judgment on legal malpractice claim where plaintiff "has not produced any evidence of

damages flowing from the 1990 representation.").  However, each cause of action

measures actual damages somewhat differently.  In a claim for common-law fraud, New

York law provides that "[t]he measure of damages in an action predicated on fraud is the

actual pecuniary loss," exclusive of attorneys' fees and other peripheral expenses.  Pope v.

Saget, 29 A.D.3d 437, 443, 817 N.Y.S.2d 1, 5 (1st Dep't 2006).  As this court has

previously observed, a defendant found liable for aiding and abetting the fraud of

another is responsible for all pecuniary losses caused by the actions of those whom he

aided, and is not limited to losses traceable to the defendant's own fraudulent

statements.[22]  See Twenty First Century L.P. I v. LaBianca, No. 92-cv- 2913, 2001 WL

761163, at *2 (E.D.N.Y. May 2, 2001) (Glasser, J.) (holding that "the appropriate measure

of damages on plaintiff's fraud claim would be the out-of-pocket loss directly and

proximately caused by LaBianca's fraudulent acceptance of kickbacks in Twenty First

Century construction jobs and those which he aided and abetted.") (emphasis added).

New York has adopted the "out-of-pocket" rule, pursuant to which a defrauded plaintiff

may recover only actual pecuniary loss, not lost profits or any benefit that the plaintiff

expected to acquire but for the defendant's fraudulent conduct.  See Lama Holding Co. v.

Smith Barney Inc., 88 N.Y.2d 413, 421, 668 N.E.2d 1370, 1373 (1996) ("Damages are to

---

[22] In Vaughn II, the court noted that the plaintiffs' fraud claim against Silver is
accurately characterized as an aiding and abetting claim.  See 2003 WL 21241669, at *6-
7.

be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained."). N.Y. Gen. Bus. Law § 349 says that a plaintiff prevailing on a claim under that section is entitled to recover "his actual damages or fifty dollars, whichever is greater," and the court may impose treble damages, in an amount up to $1,000, if it finds that the defendant's violation was willful or knowing. In a legal malpractice action, "[w]here the injury suffered is the loss of a cause of action, the measure of damages is generally the value of the claim lost." Campagnola v. Mulholland, Minion & Roe, 76 N.Y.2d 38, 42, 556 N.Y.S.2d 239 (1990). Because the damages analyses under the Vaughns' claims are not identical, the adequacy of the allegations of actual damage must be independently assessed as to each. In order to survive a motion for summary judgment, there must be sufficient evidence in the record by which a reasonable jury could find that the Vaughns have suffered an injury which would be compensable under the measure of actual damages applied by each of their claims. General allegations of harm or inconvenience that have allegedly been caused in part by Silver's malfeasance, but which could not be included in the damages calculation under the measure applied by each claim independently, are insufficient to establish actual damages as to that claim. For example, the Vaughns argue in their motion for reconsideration that they have suffered actual injuries because, instead of building equity as homeowners, they have been forced to continue renting apartments in the years since the transaction underlying this lawsuit took place. Because the rent payments that the Vaughns have allegedly been forced to make would not be compensable under any of the theories of liability they have alleged, the fact that the Vaughns have been forced to continue renting during the pendency of this action is insufficient to establish the

element of actual damages or injury.

It is clear that the Vaughns cannot establish actual injury as to any of their claims. Their claim of common-law fraud fails because the Vaughns concede that they have suffered no direct pecuniary loss as a result of the underlying transaction. As Silver points out in his memorandum of law in opposition to the instant motion, the Vaughns have conceded that they never made a mortgage payment on the home they purchased through FNNY, and that they surrendered their ownership rights in the premises at issue in exchange for the extinguishment of the mortgage note obligation. As previously noted, under New York's out-of-pocket rule, direct pecuniary loss is the only measure of damages available to plaintiffs in fraud cases; peripheral harms such as damage to the Vaughns' credit rating or incidental expenses incurred in preparing for the transaction are not cognizable injuries. See Pope, 29 A.D.3d at 443 (dismissing fraud claim where "the sum total of damages appears to have been non-pecuniary aggravation and attorneys' fees."). The Vaughns did allege actual losses in the form of payments for homeowners insurance and a pre-closing termite inspection, but they were unable to recall the name of the homeowner's insurance company, or to produce documentation supporting their claim of having made such a payment. Moreover, the documents submitted by defendant Silver in support of his motion for summary judgment clearly indicate that the termite inspection was paid for from the proceeds of the mortgage loan, an obligation toward which the plaintiffs concededly never made a payment. See Memorandum of Law in Support of Martin Silver, Esq.'s Motion for Summary Judgment at 6 (citing several exhibits in support of the fact that the termite inspection was paid for by mortgage loan proceeds).

The same holds true, for a slightly different reason, as to the Vaughns' deceptive trade practices claim. New York General Business Law § 349 does permit a plaintiff to recover on the basis of "actual, although not necessarily pecuniary, harm," Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20,26, 647 N.E.2d 741, 745 (1995), but the non-pecuniary harm must be something other than the deception itself. See Small v. Lorillard Tobacco Co., Inc., 94 N.Y.2d 43, 56, 698 N.Y.S.2d 615 (1999) (affirming dismissal of plaintiffs' § 349 claim which "sets forth deception as both act and injury."). Because the plaintiffs have failed to offer evidence of pecuniary harm, and the only non-pecuniary harm they have alleged is the act of deception itself, Silver's motion for summary judgment as to their § 349 claim must be granted.

The question of actual injury with regard to the plaintiffs' legal malpractice claim against Silver requires a closer inspection. The plaintiffs do not dispute the principle, cited above, that the measure of damages in a legal malpractice claim is the value of the claim lost. They argue forcefully, however, "but for Silver's intentional acts of fraud and breach of fiduciary duty, [the Vaughns] would today have good title to a fully renovated, legal three-family house," and that the appropriate measure of damages in this case would be the value that the home would have had if the defendants' representations as to its state of repair and certificate of occupancy had been true, including damages analogous to lost profits in the form of the rental incomes and accumulated equity they would have earned had they actually taken title to a three-family home in good

condition and suitable for legal leasing as the defendants allegedly promised.[23]  Pl. Mem.

at 10 (citing <u>Matter of Rothko</u>, 43 N.Y.2d 305, 321-322, 372 N.E.2d 291 (1977)).[24]  The

plaintiffs' argument that the value of the claim lost is measured in terms of appreciation

damages rests on their assumption that, but for Silver's fraud and malpractice, they

could have sued "for breach of contract and specific performance when such a claim

would have been timely, i.e., before the contract merged with the execution of the deed

and the claim was lost."  Pl. Mem. at 12 (emphasis omitted).  But the assumption that

the plaintiffs could have obtained "good title to a fully renovated, legal three-family

house" by means of a suit for specific performance of the contract at <u>any</u> point is

hopelessly inconsistent with the facts alleged in their complaint.  Although specific

performance is a common remedy in actions for breach of contract for the sale of real

estate, in order to sustain such a claim the plaintiffs would be "required to demonstrate

that they substantially performed their contractual obligations and were ready, willing

and able to fulfill their remaining obligations, that defendant was <u>able but unwilling</u> to

convey the property and that there is no adequate remedy at law."  <u>Abla v. Kaufmann</u>, 27

---

[23] Notably, the plaintiffs submit no evidence as to what the amount of appreciated value or rental income would be.  They do not offer, for example, expert testimony regarding lease rates at similar rental properties in the surrounding neighborhood, or a recent appraisal of the house in support of their speculative and conclusory statement that the value of the home "would today exceed $450,000, and have a fair market value as high as $500,000."  Rule 11 letter at 3.

[24] The plaintiffs' reliance on <u>Rothko</u> is misplaced.  That case involved the improper sale of estate assets by executors of the decedent's will; the Court of Appeals held that the decedent's heirs were entitled to the increased value of the assets at the time of trial, finding that the use of appreciation damages is proper when estate assets are sold below value as a result of a conflict of interest.  The court does not read <u>Rothko</u> so broadly as to imply that damages for legal malpractice should be measured on the basis of the present-day value of the opportunity allegedly lost due to the attorney's misconduct.

A.D.3d 816, 818, 810 N.Y.S.2d 539, 540 (3d Dep't 2006) (emphasis added).  In this case, according to the plaintiffs' own allegations, the defendants were not able to convey to the plaintiffs more than what they actually did convey– title to a home that was allegedly neither in good condition nor suitable for leasing.  In other words, the plaintiffs could not have brought a suit for specific performance because, after the closing, they were actually in possession of the home.  To the extent that the value of the home they purchased was lower than they reasonably expected on the basis of the defendants' allegedly fraudulent misrepresentations, the plaintiffs could have sued not for specific performance, but only for money damages based on the defendants' fraudulent inducement.  Some conflicting authority exists in New York law regarding the proper measure of damages by which to compensate a plaintiff prevailing on a fraudulent inducement claim:

> Where one is induced to enter into a contract of purchase by false and fraudulent representations, the measure of damages, as a rule, is the difference between the value of the property received and the price paid therefor, together with interest from the date of the purchase. Thus, the measure of damages where one has been induced by fraudulent representations to buy property is generally the difference between the amount paid for the property and the value thereof at the time of the sale, not the difference between what the property was worth and what it would have been worth if the representations had been true, although the courts in some decisions have applied the latter measure.

N.Y. Jur. Fraud § 260 (2006) (footnotes citing cases omitted).  Under either measure of damages, the plaintiffs have failed to offer evidence by which a reasonable jury could find actual injury.  As the court noted in Vaughn III, the plaintiffs have introduced no evidence regarding the market value of the property at the time the underlying transaction was complete.  See 2006 WL 2239324, at *13 (noting that the plaintiffs "fail

to provide any evidence at all as to the value of the property at the time of the sale or afterwards."). Thus, the plaintiffs have failed to establish the element of actual damages as to their malpractice claim against Silver.[25]

**E.** **Reconsideration of the Court's Denial of the Vaughns' Motion to Amend Their Complaint**

The plaintiffs base their argument for reconsideration of the court's denial of leave to amend their complaint to add claims against the Proposed Tanen Defendants only upon the fact that the court initially determined that such an amendment would be futile for the same reasons that it granted summary judgment to defendant Silver. The plaintiffs suggest that "to the extent that the Court may grant reconsideration of the Silver motion and, upon reconsideration, deny his motion for summary judgment, that the court should in that event also reconsider the Vaughns' motion to amend the complaint and grant that motion as well." Pl. Mem. at 2. Because the court has, upon reconsideration, affirmed its prior order granting summary judgment to Silver, there is no basis upon which for it to reconsider its denial of the plaintiffs' motion to amend.

---

[25] In <u>Vaughn II</u>, the court did not consider the plaintiffs' argument "that absent Silver's negligent and/or intentional misrepresentations and his failure to alert them to the possibility of suing for specific performance, they would have been able to enforce their contract, and should thus be entitled to the present day value of the property as damages," finding it inconsistent with the allegations put forth in the plaintiffs' First Amended Complaint. <u>Id.</u> The plaintiffs dispute that finding in their motion for reconsideration, arguing that "their allegation that Silver facilitated the purchase of the subject property through intentional fraud and/or negligence necessarily implies that Silver intentionally concealed from the Vaughns the legally appropriate alternative to proceeding with the closing, namely suing the seller for specific performance and, thereby, acquiring the benefit of their bargain described above." Pl. Mem. at 11. The court need not resolve the question of whether this argument is "necessarily implie[d]" by the allegations in the Vaughns' First Amended Complaint because, for the reasons stated above, it is unavailing in any event.

The court therefore denies the plaintiffs' motion to reconsider that decision.

## E.     <u>Final Judgment Shall be Entered Pursuant to Rule 54</u>

As the court previously noted in its discussion of the timeliness of the instant motion, Fed. R. Civ. P. 54 provides that, when a motion is dispositive as to fewer than all claims or parties, final judgment shall not be entered as to the claims or parties as to which the motion is dispositive except "upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." As the court has also previously noted, the plaintiffs filed a Notice of Appeal of the court's decision in <u>Vaughn III</u> before moving for reconsideration of that opinion pursuant to Rule 59(e). Having determined that there is no just reason to delay the plaintiffs' appeal of the issues resolved by the court in <u>Vaughn III</u> and affirmed in this opinion, the court will direct the District Clerk to enter a final judgment consistent with this order.

## <u>CONCLUSION</u>

For the reasons stated above, the plaintiffs' motion to reconsider this court's prior order holding that the plaintiffs lack standing to seek declaratory or injunctive relief against the United States Department of Housing and Urban Development is hereby DENIED. The Vaughns' motion to reconsider the court's order granting summary judgment to defendant Martin Silver, Esq., is GRANTED in part and DENIED in part. Upon reconsideration, the court finds that defendant Silver is entitled to summary judgment as to the plaintiffs' first and seventh causes of action, and his motion seeking such relief is GRANTED. The plaintiffs' motion to reconsider this court's prior order denying leave to amend the First Amended Complaint so as to allege claims against the Tanen Defendants is DENIED. The District Clerk is directed to enter a judgment

consistent with this order.

SO ORDERED.

Dated:       January 22, 2007
             Brooklyn, New York

_____/s/_____
I. Leo Glasser
United States District Judge

On this day, copies of the foregoing were sent electronically to:

Richard J. Wagner
Brooklyn Legal Services Corp. 'A'
80 Jamaica Avenue
Brooklyn, NY 11207

Hugh A. Zuber &
Peter A. Cross
Jacob, Medinger & Finnegan, LLP
1270 Avenue of the Americas
New York, NY 10020

Attorneys for Plaintiffs

Edward K. Newman
United States Attorney's Office
1 Pierrepont Plaza
Brooklyn, NY 11201

Attorney for HUD

Michael F. McGowan
Boundas Skarzynski Walsh & Black LLC
One Battery Park Plaza
Floor 22
New York, NY 10004

Attorneys for defendant Martin Silver, Esq.


James G. Ryan
Cullen and Dykman LLP
100 Quentin Roosevelt Boulevard
Garden City, New York 11530-4850

Attorneys for Jeffrey Tanen, Esq. and Bank Tanen and Bank, P.C.


George G Coffinas
Coffinas & Coffinas LLP
275 Madison Avenue
New York, NY 10016

Attorneys for the Foreclosure Network of Metro New York


Robert Mauer
1205 Franklin Avenue
Garden City, NY 11530

Attorney for Charles Salva and Charles Salva Appraisals, Inc.


Joseph M. Pastore, III
Brown Raysman Millstein Felder and Steiner, LLP
900 Third Avenue
New York, NY 10022

Attorneys for ABN AMRO Mortgage Group, Inc.